<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3   United States of America,      ) Criminal Action
                                    ) No. 20-mj-82
 4                    Plaintiff,    ) No. 20-cr-157
                                    ) Initial Appearance
 5   vs.                            ) By Telephone
                                    )
 6   Shemara Shay Mack-Smith,       ) Washington, DC
                                    ) May 11, 2020
 7                    Defendant.    ) Time:  3:20 p.m.
     _____
 8
                  TRANSCRIPT OF INITIAL APPEARANCE
 9                         HELD BEFORE
                THE HONORABLE JUDGE G. MICHAEL HARVEY
10                  UNITED STATES MAGISTRATE JUDGE

11   _____

                         A P P E A R A N C E S
12
     For Plaintiff:       Amy Larson
13                        United States Attorney's Office
                          555 4th Street, NW
14                        Washington, DC  20530
                          (202) 252-7863
15                        Email:  Amy.larson2@usdoj.gov

16   For Defendant:       Mark Carroll
                          Mark John Carroll, Esq., P.C.
17                        39641 Tern Road
                          Bethany Beach, DE  19930
18                        (443) 421-3475
                          Email:  Markjcarroll@hotmail.com
19

20   _____

     Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
21                            Official Court Reporter
                              United States Courthouse, Room 6523
22                            333 Constitution Avenue, NW
                              Washington, DC  20001
23                            202-354-3267

24

25
</pre>

```
1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *
```

2          THE COURT:  Good afternoon.  This is Judge Harvey.

3          Mr. Tran, please call the case.

4          THE COURTROOM DEPUTY:  This is case 20-mj-82, *United*

5    *States of America versus Shemara Shay Mack-Smith*.  This is

6    scheduled for telephonic initial appearance.

7          Will the parties please introduce themselves to the

8    Court, beginning with the government.

9          MS. LARSON:  Good afternoon, Judge.  Amy Larson for

10   the government.

11          MR. CARROLL:  Good afternoon, Your Honor.  Mark

12   Carroll on behalf of Ms. Shemara Shay Mack-Smith.

13          PRETRIAL SERVICES:  John Copes, D.C. pretrial

14   services.

15          THE COURT:  Okay.  Miss Mack-Smith, are you also on

16   the line?

17          THE DEFENDANT:  Yes.  Shemara Mack-Smith.

18          THE COURT:  Okay.  Good afternoon.  Where is the

19   defendant right now?  Is she --

20          MR. CARROLL:  Alexandria.  She's in the marshal's

21   lockup over there in Alexandria, Your Honor.

22          THE COURT:  Okay.  I don't know if they have video

23   capability over there or not, Mr. Carroll.

24          MR. CARROLL:  I don't think they do.

25          THE COURT:  I don't know.  I'm not aware if they do.

1    They might, they might not.  I know what the situation is at

2    the D.C. jail.  In any event, we can't proceed without the

3    defendant's permission, proceed by telephone.

4           So, Mr. Carroll, do we have the defendant's consent

5    to proceeding in this fashion, given the COVID pandemic?

6           MR. CARROLL:  Yes, we do, Your Honor.  And for the

7    Court's information, I probably spent a half an hour over the

8    phone with her already this afternoon, prior to this hearing.

9    And I have explained the charges against her.

10          THE COURT:  Good enough.  And is the court reporter

11   on the line as well?

12          THE COURT REPORTER:  Yes, I am, Your Honor.

13          THE COURT:  All right.  We have a court reporter on

14   the line.  I ask everyone speak slowly, not talk over each

15   other.  If there is an issue the court reporter has hearing

16   what's going on, please speak up so we can address it.

17          Mr. Tran, go ahead and swear in the defendant.

18          THE COURTROOM DEPUTY:  Ms. Mack-Smith, do you

19   solemnly swear that the answers you're about to give will be

20   the truth, so help you God?

21          THE DEFENDANT:  Yes.

22          (The defendant, being duly sworn, testified as

23   follows:)

24          THE COURT:  Ms. Mack-Smith, can you please state your

25   name for the record?

 1           THE DEFENDANT:  Shemara Mack-Smith.

 2           THE COURT:  Ms. Mack-Smith, how old are you?

 3           THE DEFENDANT:  Thirty-nine.

 4           THE COURT:  How far did you get in school?

 5           THE DEFENDANT:  Some high -- or, some college.

 6           THE COURT:  Have you taken any drugs, alcohol or

 7    medicine in the past 24 hours that would make it difficult for

 8    you to understand what's happening here today?

 9           THE DEFENDANT:  No.

10           THE COURT:  Ms. Mack-Smith, you're here for purposes

11    of an initial appearance.  I'm going to tell you the charge

12    that you presently face, the consequence if you're found guilty

13    of that charge.  I'll make sure you understand your rights and

14    appoint you an attorney, if you're eligible and if you wish the

15    Court to appoint you an attorney, then we're going to have a

16    discussion about whether or not you're going to be released

17    here today and, if so, on what conditions.

18           THE DEFENDANT:  Okay.

19           THE COURT:  Ms. Mack-Smith, you're here because, as

20    you know, you were arrested and you've now been charged by

21    federal criminal complaint with distribution of child

22    pornography, in violation 18 U.S.C. Section 2252(a)(2).  If

23    you're found guilty of that charge, you could face imprisonment

24    of not less than five years and up to 20 years in jail, a fine

25    of $250,000, or both.  In addition, the Court would impose a

1    period of supervised release of not less than five years and up

2    to life to follow any term of incarceration.

3           Ms. Mack-Smith, you have certain rights at this

4    point.  You have the right to remain silent.  Anything you say

5    can be used against you.  Do you understand that right?

6           THE DEFENDANT:  Yes.

7           THE COURT:  You also have the right to an attorney.

8    If you can't afford to hire an attorney with your own money,

9    the Court will appoint an attorney to represent you free of

10   charge, if you're eligible.  Do you understand that right?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Mr. Carroll, are you retained counsel on

13   this case?

14          MR. CARROLL:  No, appointed.  FPD had a conflict,

15   Your Honor, and they asked me to come into the case.

16          THE COURT:  All right.  So, Ms. Mack-Smith, do you

17   want to hire an attorney with your own money or would you like

18   the Court to appoint Mr. Carroll to represent you in this case?

19          THE DEFENDANT:  I would like to have Mr. Carroll.

20          THE COURT:  All right.  So I've got to ask you a few

21   questions to determine whether or not you're eligible for the

22   appointment of counsel.  Ms. Mack-Smith, are you presently

23   employed?

24          THE DEFENDANT:  Yes.

25          THE COURT:  How much money do you make a year in that

1    job?

2              THE DEFENDANT:  About 80,000.

3              THE COURT:  Okay.  And how much money do you have in

4    the bank?

5              THE DEFENDANT:  $1,000.

6              THE COURT:  Do you own a home?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Do you have a mortgage?

9              THE DEFENDANT:  Yes.

10             THE COURT:  How much is your mortgage a month?

11             THE DEFENDANT:  Monthly, about 2800.

12             THE COURT:  Okay.  Mr. Carroll, I don't have the

13   benefit of a final affidavit.  I'm not sure if you've discussed

14   with her what her other expenses may be so that I can make a

15   determination whether or not --

16             MR. CARROLL:  She has child care expenses as well,

17   Your Honor, and I'm sure utilities, and I'm sure they're paying

18   on a car as well, Your Honor.

19             THE COURT:  Ms. Mack-Smith, do you have dependents?

20   Do you have kids?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Okay.  Well, I mean, I'm trying to get an

23   idea.  You do make more than many defendants in front of me,

24   $80,000, a year.  So I need an understanding of what your

25   expenses are.  You told me you have about $2800 a month in a

1    mortgage you have to cover.  What other major monthly expenses

2    do you have?

3           THE DEFENDANT:  I have two vehicles, one is $700 a

4    month, the other vehicle is $450 a month, I would say,

5    approximately.  There are child care expenses that I do pay to

6    family members, that's about $200 every week.  And then all of

7    the utilities; gas, heating, electric, water, and sewer,

8    there's also a $1200 bill that's coming up soon on the home as

9    well.

10          THE COURT:  What's that bill for?

11          THE DEFENDANT:  It's a sewer bill.  It's something to

12   do with the home and the sewage.  I have to pay $1200 annually

13   on it.

14          THE COURT:  How much are all your utilities, do you

15   think, combined?

16          THE DEFENDANT:  Average?

17          THE COURT:  Yep.

18          THE DEFENDANT:  Probably between 13- and 1500.

19          THE COURT:  Okay.

20          THE DEFENDANT:  Telephone, vehicle.

21          MR. CARROLL:  Ms. Mack-Smith, do you also pay

22   insurance bills on your house and your car?

23          THE DEFENDANT:  Yes.

24          MR. CARROLL:  And how much are those a month -- or a

25   year, if you know?

1          THE DEFENDANT:  The insurance on the home is anywhere

2     from 250 and 300, it varies.  And the insurance on the car is

3     also between 200 and $300.

4          THE COURT:  Is that per month?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Ms. Mack-Smith, I do find you're eligible

7     for appointment of counsel and I will appoint Mr. Carroll to be

8     your attorney in this case.  Do you consent to him being your

9     attorney?

10          THE DEFENDANT:  Yes.

11          THE COURT:  You also have the right to a preliminary

12     hearing and through the preliminary hearing the government

13     would have to come forward and demonstrate that the crime that

14     you've been charged with occurred and that you committed that

15     crime.  We'll set the date for your preliminary hearing here in

16     a moment.

17          Does the government have any request with respect to

18     this defendant's release here today?

19          MS. LARSON:  Yes, Judge.  The government is asking

20     that this defendant be detained pending trial.  As this Court

21     is aware, the defendant is charged with distributing child

22     pornography, which we are entitled to a detention hearing under

23     3142(e)(2) and (f)(1)(A) because it is a crime of violence.

24     Also, an offense involving a minor victim.

25          So as the Court is aware, there's a rebuttable

1   presumption that no condition or combination of conditions can

2   reasonably assure the safety of any other person in the

3   community.

4           THE COURT:  Mr. Carroll, I assume you're in the loop

5   about the understanding that AJ Kramer has struck with the

6   government with respect to preliminary hearings, detention

7   hearings during COVID.  My understanding is that Mr. Kramer

8   indicated that they would be willing, in most cases, to delay

9   the preliminary hearing in the case, in a given case, provided

10  that the government goes to the detention hearing at the

11  initial appearance.

12          It's not a requirement.  And defense attorney can, as

13  I understand it, in a given case, not waive the right to a

14  timely preliminary hearing and do their own thing in the case.

15  But that's my understanding of the agreement.

16          If we are going to go forward with the detention

17  hearing today -- the case has not been indicted, as you know.

18  I don't think the government has come with a witness, and it

19  wants to proceed by proffer.  So we would need to get your

20  consent to then do it so.

21          MR. CARROLL:  Yes.  I would like to do that, Your

22  Honor.  I've explained to Ms. Mack-Smith that in all likelihood

23  the government would be asking that she be held.  I have

24  argument going against that, Your Honor, once the Court has

25  heard from the government.

```
1           THE COURT:  I hear you.  So you would consent to the

2     government going forward by proffer here today, yes?

3           MR. CARROLL:  Yes.  That's correct, Your Honor.

4           THE COURT:  Here's the issue:  The wrinkle here,

5     which has not been covered as part of any agreement that I'm

6     aware of between the U.S. Attorney's Office and the Federal

7     Public Defender, is what do you do in a case where, like this

8     one, there's a rebuttable presumption?

9           Usually where there's been a finding of probable

10    cause, either by a grand jury or, in a preliminary hearing, by

11    the Court, the case law in this jurisdiction makes clear that

12    that is sufficient to trigger the rebuttable presumption.  We

13    have neither in this case; not an indictment and not a

14    preliminary hearing.

15          So what's -- I'll start with the government.  I want

16    to know the government's position, whether or not it would be

17    appropriate for this Court to consider the rebuttable

18    presumption in this case, and then I want to hear from Mr.

19    Carroll on that issue.  Government?

20          MS. LARSON:  Judge, I can only speak with what -- the

21    practice that we've developed in these very novel circumstances

22    in the month of April under Judge Robinson.  In those cases we

23    were moving, frankly, under the factors that the Court would

24    consider.  And Judge Robinson did not assign the rebuttable

25    presumption for the exact reasons that you just cited in this
```

1    case.  One, we, obviously, did not have a preliminary hearing.

2    And, two, as the Court is aware, and in the current standing

3    order, we simply do not have the ability to get in front of the

4    grand jury for an indictment.

5          So Judge Robinson was weighing the statutory factors

6    that are in 3142(g), I believe, and not applying rebuttable

7    presumption.

8          THE COURT:  Okay.  Mr. Carroll, I assume you would

9    have no objection to that?

10          MR. CARROLL:  That's correct, Your Honor.

11          THE COURT:  Okay.  All right.  Well, you mentioned

12   rebuttable presumption, but I just don't see how I can apply it

13   in this case, given that there has been no finding of probable

14   cause.

15          Government, are you prepared to go forward to the

16   detention hearing now?

17          MS. LARSON:  Yes, Judge.  That is consistent with our

18   practice and our agreement with the Federal Defender's office.

19   So I am prepared to proceed, if the Court's ready.

20          THE COURT:  Is there a detention memo?  I haven't

21   found one, if there is.

22          MS. LARSON:  No, Judge.  The government has not filed

23   a detention memo in this case.

24          THE COURT:  Okay.  Well, I think I might have signed

25   a complaint in this case.  But, I mean, you know, vague

1    recollection of what the facts are.

2            MS. LARSON:  Yes, Judge.  Judge, in terms of the

3    factors you should consider, we'll start with the nature and

4    circumstances of the offense charged.  This is a very serious

5    offense, that's why there's a five-year mandatory minimum.

6    And, as the Court is aware, the guidelines range is

7    substantially higher than 60 months mandatory incarceration.

8            This is a case in which this offender is in a group

9    of online offenders who traffic in child pornography using

10   various types of encrypted social media applications.

11   Additionally, what makes this a more egregious offense, Your

12   Honor, is that it appears, as is consistent with the

13   information in the complaint, that not only do these offenders

14   communicate online and use an encrypted method to maintain

15   anonymity, but these offenders are also meeting one another in

16   person, not only for the purposes of distributing and receiving

17   child pornography, which is laid out in the complaint, but also

18   to sexually abuse children.

19           As the Court is aware and what is cited in the

20   complaint, approximately a week and a half ago Devon Janine

21   Miller was arrested.  Ms. Miller and the defendant know each

22   other personally and have known each other for years.  It's the

23   government's information from witness interviews in this case

24   that as recently as two weeks ago the defendant was in

25   Ms. Miller's home.

1    This is particularly concerning to the government

2    because as the investigation into Devon Miller continues, it

3    has become aware that Ms. Miller is sexually abusing -- or, was

4    sexually abusing children, including her own child, using child

5    pornography, as well as selling access to that child to other

6    offenders that were in this group.  The government has grave

7    concerns at this point that this defendant's conduct extends

8    beyond just the four corners of the complaint, but might also

9    involve hands-on abuse of children.

10    So the nature and circumstances here weigh heavily in

11    favor of detention.

12    THE COURT:  What is she actually charged with doing?

13    MS. LARSON:  This defendant, Judge, is charged with

14    distributing child pornography.  As laid out in the complaint,

15    the government has interviewed a witness who has met the

16    defendant in person.  During their in-person interactions the

17    defendant expressed a sexual attraction to children, who she

18    referred to as "littles," and then she distributed a series of

19    images and videos which depict the sexual assault and sexual

20    abuse of very young children.

21    When that witness brought this information to law

22    enforcement -- to law enforcement's attention, as detailed in

23    the complaint, at that point law enforcement assumed this

24    defendant's -- I'm sorry, assumed the witness's online identity

25    and within a very short time period this defendant did send the

1    online officer numerous videos, again, depicting the sexual

2    abuse of very young children.

3           So this, in and of itself, is a very serious offense.

4    Like the government has said, carries the mandatory minimum

5    sentence of five years.  There is the exacerbating factor of

6    being an online community which promotes sexual interest and

7    attraction and exploitation of children in trafficking this

8    material.

9           It is further disturbing and of great concern to the

10   government that these offenders are actually meeting in person

11   and the purpose of those meetings is the abuse and exploitation

12   of very young children.  That's what we're seeing in both the

13   Devon Miller case and as well as here we are at the point of

14   analyzing digital devices that were taken off the defendant's

15   person to determine the nature and extent of her criminal

16   culpability.

17          The weight of the evidence also weighs in favor of

18   detention.  We have the images and videos not just to the

19   witness, but as well as to the undercover.  We do have proof

20   that this defendant knows Ms. Miller.  There's photographic

21   proof of that, as well as meeting in person.  The witness puts

22   them there and at her house as recently as two weeks ago.

23          We recovered, in the course of the search warrant,

24   numerous digital devices, including a cell phone which was

25   taken out of the defendant's hand when law enforcement entered.

1    When she was questioned by law enforcement subsequent to her

2    arrest, she did admit to using the various applications that

3    had been used to distribute child pornography to the undercover

4    officer.  She also admitted that she had seen materials which

5    she described as graphic.

6           Additionally, Judge, we move on to the history and

7    characteristics of this offender.  The government is aware that

8    she's not had any prior arrests.  However, the Court is aware

9    that is not unusual in cases such as this where the offenses

10   are done in secret, where they can be easily committed using a

11   handheld device and wireless access, and the fact that the

12   sexual abuse of children is something that is a widely under-

13   reported crime.

14          Nevertheless, Judge, we have become aware through law

15   enforcement that this defendant has twins who are 18 years old.

16   My understanding is that it was only one week ago on Sunday

17   that there was an altercation in the house between the

18   defendant and one of these 18-year-olds.  And, in fact, the

19   other twin jumped in and now neither of those are residing in

20   the house.  It is unclear to me whether or not that resulted in

21   any law enforcement intervention.  But there's clearly been

22   some violent episodes in the house quite recently.

23          THE COURT:  I'm sorry, you said that that's with this

24   defendant's children?

25          MS. LARSON:  With two of her three children, yes,

1     Judge.

2          THE COURT:  Tell me about her children.  Tell me how

3     many children she has, and what are their ages?

4          MS. LARSON:  My understanding is that there are

5     three.  There are two 18-year-olds who are twins, they were

6     residing in the home as recently as one week ago when there was

7     an altercation which turned physical.  And I believe the two

8     18-year-olds are no longer residing in the home.

9          What is concerning to the government is that there is

10    a seven-year-old little boy, her son, who is residing in the

11    home.  So, therefore, that's another factor that would weigh

12    heavily against this defendant being released, certainly of

13    going home and being in any sort of care, custodian of the

14    father when there is a seven-year-old child in the house, given

15    the nature of these charges.

16         So while the history and characteristics, Judge, may

17    not weigh in favor of detention, certainly the serious nature

18    for the -- serious nature of the danger to any person in the

19    community, not only her own seven-year-old child who resides in

20    the house, but children at large in the community is a factor

21    that weighs heavily in favor of detention.

22         So for all those reasons, the government asks this

23    defendant be detained pending trial.

24         THE COURT:  Okay.  Mr. Carroll.

25         MR. CARROLL:  Yes, Your Honor.  The -- Devon Miller,

1    who is identified as Witness Number One in the complaint, has

2    been a friend of the defendant's for years.  So this is not

3    something that she stumbled upon in a chat room.  And Devon

4    Miller introduced her to an individual named Eli, who's Witness

5    Number two.  And it appears from the wording of the affidavit

6    in support of arrest warrant, that Eli is a cooperator and that

7    Eli -- that Eli pretty much set this whole thing up and he's

8    trying to work off a case here.

9         There's no suggestion that defendant ever knew that

10   Devin Miller might have been abusing her own child.  I don't

11   see any reference to that.

12        The -- there are only two occasions here in the

13   allegations that she had sent child pornography.  In one case

14   it was four -- four videos or pictures, and in the other case

15   it was four as well.

16        Now, Eli, the cooperator in this case -- obviously is

17   a cooperator because it appeared from the affidavit that he

18   turned over his Facebook account to Tim Polchak, who has gotten

19   thousands of people in these type of stings here.  That's all

20   you have on the defendant here.

21        Your Honor, she has worked for the FDA for 13 years.

22   She's a project manager.  She's been working out of her house.

23   Her husband is a mechanic, they have a seven-year-old son.  If

24   the Court is concerned about the seven-year-old son, the

25   defendant and her husband has other family members, including

1     grandparents, that could take care of the son, if that's the

2     case.

3          She has been working from home and she's been working

4     from a laptop.  I don't know if the FBI took that laptop from

5     her house when they were there.  If not, there's programs that

6     you could put on there where they could track what she's doing.

7     It's my understanding from the accusations that anything that

8     came off in this case came off a cell phone and it came off of

9     Facebook and also another app called Telegram.  And they could

10    track anything they wanted on that with her.

11          Additionally, when she got brought over to the

12    sheriff's office in Alexandria, she had a sore throat and a

13    cough.  And she has seasonal allergies.  And they told -- she

14    had told them about that as she got in there and they

15    immediately put her into isolation.  And the -- she has health

16    concerns.  She has been treated for anxiety and depression for

17    the last year or so.  She has anemia.  And, Your Honor, she's

18    heavier than 270 pounds and suffers from sleep apnea.

19          If there's any person -- all the reading I've done on

20    this COVID-19, if there's any type of person that would be at

21    risk, it would be someone with this, being that overweight,

22    because you're borderline diabetic, you're high blood pressure.

23    And this virus is making its way through entire body systems

24    and attacking where you're weak.

25          In addition to that, she's been on Prozac for the

1     last year.  And they have her in her cell 24 hours a day, by

2     herself.  The last place you want to put a person suffering

3     from depression is in isolation, by herself.  I would ask --

4                THE COURT:  Why is she in isolation?

5                MR. CARROLL:  Because she's suspected of having

6     COVID-19 -- possibly having COVID-19.  She has not been tested

7     for it or been officially diagnosed, but they had put her in

8     that for that reason.

9                THE COURT:  I don't know, if I went in the jail, Mr.

10    Carroll, it might be a toss-up about where I would want to be,

11    in isolation or not.

12               MR. CARROLL:  Your Honor, I don't disagree.

13               THE COURT:  I don't know what's happening out in

14    Alexandria.  I know what is happening in D.C. jail.  But is

15    COVID an issue out there?

16               MR. CARROLL:  It's an issue everywhere in the

17    country, Your Honor.

18               THE COURT:  Well --

19               MR. CARROLL:  The jails are considered Petri dishes

20    for this.

21               THE COURT:  I know the facts about D.C. jail, I don't

22    know the facts about Alexandria.  I've got to tell you, I don't

23    know.

24               MR. CARROLL:  I do not have the specific facts, Your

25    Honor, but between that and what I've seen in Baltimore, all

1    these jails have been Petri dishes for COVID-19.

2            But on top of it, Your Honor, I mean, the last place

3    you want to put a person that's suffering from depression is

4    in, you know, solitary confinement, is what she's in.  There's

5    got to be -- she has never been arrested before.  There's got

6    to be some conditions that the Court can fashion that she could

7    stay at her house in Accokeek, Maryland.

8            I've provided Mr. Copes with her husband's name and

9    phone number, the address, that you could put a GPS on it.  If

10   she's continuing to work for the Food and Drug Administration,

11   they could put a keystroke monitor on her computer, or look in

12   some other way on that and determine what she's looking at, if

13   that's the Court's concern.  But, I think she's a time bomb

14   waiting to happen, given her health history and where she's

15   being held.  And with no criminal history.

16           THE COURT:  Okay.  Let me hear from pretrial.

17           What can be done with respect to individuals who are

18   charged with this crime?  What capabilities does pretrial have

19   to monitor this defendant's electronics?

20           PRETRIAL SERVICES:  At the present time, I'm unaware

21   of anything additional that PSA is actively doing to monitor

22   someone charged with -- individuals charged with this type of

23   case.  If the defendant -- due to the Adam Walsh Act, the

24   defendant would need to be on GPS monitoring, if she was

25   released.

1          MR. CARROLL:  We have no objection to that.

2          PRETRIAL SERVICES:  But I'm not aware of anything

3     that PSA is doing additionally.  I've not had word of anything

4     that's in place right now that PSA, Your Honor, is able to do

5     electronically.  Potentially could be in the works, but I would

6     need to contact my supervisor to see if there is anything

7     additional that PSA would be able to do.

8          THE COURT:  Well, I knew something was in the works,

9     but that was before the pandemic.  I don't know what's come of

10    that and if the pandemic would interfere in the ability of PSA

11    to do that monitoring.  I mean, I just don't know.

12         MR. CARROLL:  Well, Your Honor, I'm sure she has --

13    she does her work at home on a work computer, not on a -- not

14    on a personal computer.  So I'm sure that it could be tracked,

15    if that was of any concerns to the Court.

16         THE COURT:  Well, the issue is:  Do they have the

17    program?  Is the contract in place to do the tracking?  How

18    does the tracking work during COVID?  How do they get the

19    software on this computer?  Is there some service that's

20    actually doing the tracking?  How reliable is it?  These are

21    all things I don't know.

22         I know it's something, a capability -- they had

23    nothing -- they had no capability, I don't know, a year ago.

24    And I know they've been working on it, trying to get increased

25    capability.  And I don't know if that's completed and if it's

1    otherwise adversely impacted by COVID.

2          MR. CARROLL:  Well, Your Honor, we would be willing

3    to let them take any computer out of the house they want to, if

4    that's the case.

5          The likelihood is, the nature of these charges, that

6    she's going to lose her job with the FDA.  So if that's the

7    case, I would just as soon, for health reasons, get her out of

8    jail and get her home.  And like I said, if they wanted to take

9    any computer out there, you know, we wouldn't object to that.

10   I'm surprised that -- she wasn't there when they completed the

11   search.  I would have to guess that they have all of her

12   computers.

13         THE COURT:  Okay.  Government, what can you tell me?

14         MS. LARSON:  Judge, a few points of clarification.

15   One, Devon Miller is named separately in the complaint.  She is

16   not Witness One.  If anything, she would be a co-conspirator or

17   co-defendant.  She is not someone that the government is

18   drawing on as a witness.

19         THE COURT:  Has she been arrested?

20         MS. LARSON:  Yes, Judge.

21         THE COURT:  Is she being held?

22         MS. LARSON:  Yes, Judge.  She is detained.  She is

23   detained.

24         The problem here is -- sending this defendant back

25   home is not a working solution, when there is a minor child who

1   is only seven years old.  And, again, the type of material that

2   this defendant has been trafficking in with people that she

3   meets online, as well as people that she has a personal

4   relationship with, who is Ms. Miller.  While they may have

5   known each other for years, it is absolutely certain that they

6   are in the same online chat rooms and using the same types of

7   applications in order to discuss their sexual attraction in

8   children and to traffic in child pornography.

9           This is a crime that can be easily committed in

10  secret, using a handheld device.  It is something that can be

11  easily done with access to the internet.  And now we're hearing

12  that there would need to be a laptop or some sort of electronic

13  devices in the home for this defendant to stay home and work.

14  Uprooting a seven-year-old child and sending them somewhere

15  else is not exactly a workable situation.

16          Furthermore, without the ability to monitor her

17  access to the internet or any sort of digital devices, there is

18  no way to assure this Court that she is not continuing her

19  criminal activity.  This was not a one-time thing, this was not

20  a mistake; this is ongoing conduct.

21          So for all of the reasons stated, and I believe,

22  also, consistent with pretrial's recommendations, that there

23  are no combination of circumstances here that could reasonably

24  assure the safety of any member of the community, including not

25  only her own child, but other child victims as well.  The

1    government is asking that this defendant be detained.

2            THE COURT:  And, Mr. Copes, what is pretrial's

3    position in this case?

4            PRETRIAL SERVICES:  Pretrial's position remains the

5    recommendation that no condition or combination of conditions

6    can reasonably assure the defendant's appearance or the safety

7    of the community.

8            THE COURT:  Okay.  I'm going to grant the

9    government's request and order the defendant be held pending

10   trial in this case.

11           Mr. Carroll, perhaps in the coming days you'll answer

12   some of the questions -- I'll highlights some of the questions

13   I have -- and come up with a better plan than what was offered

14   here today.

15           MR. CARROLL:  Okay.

16           THE COURT:  But, you know, given what's before me

17   now, I'm going to order that she be held, just like her

18   co-defendant.  Obviously, she's got no prior convictions, she,

19   you know --

20           MR. CARROLL:  She has no prior convictions, Your

21   Honor.

22           THE COURT:  I said she's got no prior convictions.

23           MR. CARROLL:  Oh, okay.  I'm sorry.

24           THE COURT:  I hope that's what I said, that she's got

25   no prior convictions.  And she's never evidenced an inability

1   to comply with court orders as a result of that.  I think that

2   factor, the history and characteristics of this defendant, does

3   favor her release.  And I would include in there the health

4   conditions that were highlighted by her attorney.  To the

5   extent that COVID is an issue out in Alexandria, I don't know

6   that it is.  And I don't know that -- placing her in isolation

7   right now, how to weigh that.

8            I hear that she suffers from depression.  Agree that

9   being in isolation is probably not good for that condition, but

10  it may be where she wants to be, given her other physical

11  conditions that could make her more susceptible to COVID, if

12  that's an issue out in Alexandria.  I know it's an issue in the

13  D.C. jail.  I just don't know.  That's one area, Mr. Carroll,

14  if you care to further investigate that.

15           MR. CARROLL:  Okay.

16           THE COURT:  Second, I don't know of a way right now,

17  during COVID, that pretrial can reliably monitor this

18  defendant's access to the internet.  This is an internet-based

19  crime.  And I don't know how many phones are in that house, I

20  don't know if they've been pulled out by the FBI.  Certainly

21  phones are readily available in this country.  And, you know,

22  the extent to which she's living with adult children, or with

23  another adult in the house, they have phones that she could

24  have access to.  How that could be monitored, whether or not

25  pretrial could have the ability to do that, if they've got the

1    software, they've got the contract, they've got the monitoring

2    service and all of that is working reliably during COVID, I

3    just don't know.  I just don't know.  And not knowing that, I

4    don't believe I can fashion conditions of release.

5            I would also highlight the nature and circumstances

6    of this offense, which are very serious.  She faces a five-year

7    mandatory minimum for a reason.  This is a very serious crime

8    that targets the most vulnerable in our society, minors, and

9    does great damage to them.

10           She has, best I can figure out, has been charged with

11   distributing child pornography of minor children being sexually

12   abused.  I do hear the government's proffer regarding this is

13   activity that was online, was secret, was using encrypted apps,

14   and which gives me concern as well, to the extent to which it

15   can be reliably monitored by pretrial.

16           I'm also concerned about the larger factual proffer

17   in this case concerning the co-defendant, the abuse of --

18   alleged abuse of that defendant's minor child, who this

19   defendant has known for some time, and seemed, according to the

20   government's proffer, to be freely discussing, sharing child

21   pornography with that co-defendant and others.  So that

22   concerns me.  There is a group who were engaging in this

23   unlawful and very serious conduct.

24           It concerns me as well with my ability to monitor

25   it -- or, have pretrial monitor it -- and the danger that it

1    represents to community.  I think the strength of the

2    government's evidence, appears to me to be strong in this case

3    and that it is supported by at least one witness, if not two.

4    I have no idea if there's a cooperator or not in this case, but

5    there do appear to be witnesses.

6         And, also, the use of an undercover, multiple

7    distributions of the child pornography, which the government

8    tells me is supported by the digital evidence in this case.

9    The images, the four received have been retained and are

10   available for you at trial.

11        So for all of those reasons, I do find that the

12   defendant represents a danger to the community.  And I note, as

13   well, the issue with respect to a minor child, seven years old,

14   being in the house.  I do not have any plan going forward as to

15   how that would be addressed, and I'm not about to send her back

16   to a place where there are minor children.

17        So, Mr. Carroll, maybe you can answer those

18   questions, come up with a better plan.  I don't know if my

19   decision would be any different after you do that, but I would

20   certainly listen to it.

21        But based on what's before me here today, I'm going

22   to grant the government's request.  And I do that based on the

23   four factors, not considering the rebuttable presumption of

24   detention that would otherwise apply to these charges if there

25   had been a probable cause finding.

```
 1              MR. CARROLL:  Very well, Your Honor.

 2              THE COURT:  So that leaves then -- we got to set the

 3    date for the preliminary hearing.

 4              Mr. Carroll, most defense attorneys have been doing

 5    that after -- and I'll pick a date after we reopen, which is

 6    presently scheduled to be in June.  I don't know if that's

 7    going to actually happen, meaning I don't know when the court

 8    is going to be open.  But that is what the Court's order says

 9    right now, so we've been setting dates.  Maybe we should set a

10    date the week of June 15th.

11              MR. CARROLL:  June 15th?

12              THE COURT:  What would work for you?

13              MR. CARROLL:  15, 16, and 17th are fine.  Or, 16th

14    through the 18th is fine.  Any of those three days.  Whatever

15    is convenient for the Court.

16              THE COURT:  Mr. Tran, what do you think?  This is all

17    bad, I know.

18              THE COURTROOM DEPUTY:  Yeah, the 19th looks good,

19    Your Honor.

20              THE COURT:  All right.  Let's do the 19th.  That will

21    be at 1:45, before Magistrate Judge Meriweather.  That will be

22    scheduled for preliminary hearing.

23              Mr. Carroll, do you waive now, on behalf of this

24    defendant, her right to an earlier preliminary hearing in this

25    case?
```

1          MR. CARROLL:  Yes, I do, Your Honor.

2          THE COURT:  Okay.

3          MR. CARROLL:  Your Honor, will this preliminary

4     hearing -- will this be done in the courthouse or will it be

5     Skyped or --

6          THE COURT:  Right now it will be in the courthouse.

7     Right now you should be planning to come to the courthouse and

8     the defendant will be delivered to the courthouse.  That's the

9     present plan, but that could change.  It may be that we do it

10    this way, or by video, or that it's somewhere in between, with

11    attorneys in the courthouse and the defendant appearing by

12    video from Alexandria or wherever she is housed.

13          So we just don't know.  Every week is a new week.

14    And you should reach out to the Court that week to see how

15    proceedings are going forward.  Something will certainly happen

16    that day.  And if we need to have a preliminary hearing by

17    video, we'll be prepared to do that.

18          MR. CARROLL:  Very well, Your Honor.

19          THE COURT:  Anything further from the government?

20          MS. LARSON:  No, Judge.

21          THE COURT:  From the defense?

22          MR. CARROLL:  Just, Ms. Mack-Smith, I will give you a

23    call this week over in Alexandria there.

24          THE DEFENDANT:  Okay.  Thank you.

25          MR. CARROLL:  All right.

1          THE COURT:  Okay, then.  Parties are excused.

2          MR. CARROLL:  Thank you, Your Honor.  Have a nice

3   day.

4                          *   *   *

5

6

7

8          CERTIFICATE OF OFFICIAL COURT REPORTER

9

10     I, JANICE DICKMAN, do hereby certify that the above and

11   foregoing constitutes a true and accurate transcript of my

12   stenographic notes and is a full, true and complete transcript

13   of the proceedings to the best of my ability.

14                     Dated this 8th day of February, 2024

15

16

17          _____

18          Janice E. Dickman, CRR, CMR, CCR
            Official Court Reporter
19          Room 6523
            333 Constitution Avenue, N.W.
20          Washington, D.C.  20001

21

22

23

24

25